IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

GREGORY R. PLUMP,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )        2:12-CV-257-APR
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of the Social Security   )
Administration[1],                    )
                                      )
            Defendant.                )


OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the

Commissioner of Social Security filed by the plaintiff, Gregory Rasheed Plump, on July 5, 2012.

For the reasons set forth below, the decision of the Commissioner is **REMANDED**.


Background

The plaintiff, Gregory Rasheed Plump, applied for Disability Insurance Benefits and

Supplemental Security Income on August 15, 2008, alleging a disability onset date of July 1,

2005.  (Tr. 165-176)  His claim initially was denied on November 5, 2008, and again denied

upon reconsideration.  (Tr. 88-102) Plump requested a hearing before an Administrative Law

Judge ("ALJ").  (Tr. 20-21)  A hearing before ALJ Karen Sayon was held on January 4, 2011, at

which Plump, witness Beverly Childress, and Vocational Expert Edward Paul Stophen testified.

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social
Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

(Tr. 43-87)

On January 13, 2011, the ALJ issued a decision denying benefits. (Tr. 24-42) The ALJ's decision was upheld by the Appeals Council on March 29, 2012. (Tr. 3-8) Plump requested additional time to file a civil action, which was granted. (Tr. 1-2) Plump filed his complaint with this court on July 5, 2012.

Plump was born on January 15, 1952, making him 53 years old on the alleged onset date. (Tr. 189) He stands 6'2" tall and weighs approximately 215 pounds. (Tr. 192) Plump completed two years of college and had prior relevant work as an assembler, which was considered heavy as performed, a data entry/medical billing clerk, and a laborer. (Tr. 194, 256) He was insured for purposes of DIB through December 31, 2008. (Tr. 187)

Plump alleged disability due to right eye blindness, left eye visual impairments, stroke, hypertension, arthritis, frequent headaches, gout, and major depression. (Tr. 193) On June 24, 2004, Plump was prescribed a knee immobilizer spint from St. Margaret Mercy Hospital. (Tr. 423) On September 8, 2004, Plump was treated for cervical strain, lumbar strain, and knee contusion and was prescribed Vicodin, Naprosyn, and Norflex. (Tr. 424-26) Later that month, he was treated for degenerative joint disease. (Tr. 326-327) On October 20, 2004, Plump was treated at Oak Forest Hospital for degenerative joint disease, pain, and frequent headaches post motor vehicle accident. (Tr. 305, 428-434) The following month, Plump went to the emergency room for a head and neck injury caused by the motor vehicle accident and frequent headaches. (Tr. 438) Plump was hospitalized in June 2009, where he was diagnosed with radiculopathy, a pinched nerve in the neck, and sciatica, and he was prescribed Tylenol and codeine after an EMG/nerve conduction study. (Tr. 383, 385-87, 388-89, 398-408). On June 22, 2009, Plump was

prescribed Norflex and Vicodin for cervical radiculitis. (Tr. 409-13). On November 30, 2009, Plump was given Naproxen after complaints of left shoulder pain since June 2009. (Tr. 418). Three months later, Plump was diagnosed with left shoulder adhesive capsulitis. (Tr. 361, 374, 419-20).

On July 31, 2007, Plump was treated at Oak Forest Hospital for uncontrolled hypertension, and it was noted that he had a history of substance abuse. (Tr. 292-99, 308-09) His blood pressure was recorded at 190/115, and his weight was listed as 225 pounds. (Tr. 292-99, 308-09) Plump was instructed to monitor his weight and to stop smoking. (Tr. 292-99, 308-09) His blood pressure was taken on numerous other visits, none exceeding 138/94. (Tr. 300)

Plump sought treatment at Oak Forest Hospital for blurred vision on December 27, 2007. (Tr. 340) His visual acuity was 0 in the right eye and 20/50 on the left with note of ischemic central retinal vein occlusion ("CRVO"). (Tr. 340) Plump was treated several more times through June 2008 for CRVO and was reported as having 20/30 visual acuity in the left eye. (Tr. 300-03, 325, 442-43). On October 2, 2008, he again was treated for ischemic CRVO with left eye acuity at 20/30. (Tr. 323-24, 44). On October 20, 2008, Plump was treated for open-angle glaucoma and ischemic CRVO status post pan-retinal photocoagulation with visual acuity on the left at 20/40. The doctor determined that Plump suffered from hypertension, blurred vision, and glaucoma. (Tr. 321-22, 445). On March 25, 2009, Plump's left eye visual acuity was 20/30 with a diagnosis of CRVO. (Tr. 417). Plump continued ophthalmology check-ups in 2009 and 2010. (Tr. 269, 357-358, 363, 365, 370-371, 373, 376-377, 393-395, 414) On April 28, 2010, Plump was treated for visual acuity of 20/25 in the left eye and was diagnosed with CRVO and primary open angle glaucoma and Maddox rod at -10.25 on the left. (Tr. 368, 422).

Plump self-reported treatment between 1999 and 2000 for depression. (Tr. 196) On September 30, 2008, Plump was treated for depression and was given a renewable Wellbutrin prescription. (Tr. 326-27). The physician's progress note indicated that Plump's depression was assessed as stable. (Tr. 326) On October 11, 2008, Plump underwent a psychological consultative examination by Alan Jacobs, PhD. Dr. Jacobs noted that Plump awoke one morning and his vision was blurry, especially in the right eye. (Tr. 311-313) Plump was diagnosed with depression around 2000 and saw a psychiatrist on an outpatient basis. (Tr. 311-313) He described himself as a loner, was easily angered, seldom had more than one friend, and admitted that his depression affected his memory. (Tr. 311-313) Dr. Jacobs noted that Plump spoke using mildly below average grammar, his legs and hands shook several minutes into the exam, his affect appeared to be primarily depressed, he had a history suggestive of mild assaultive risk and alcohol withdrawal, and his long term memory appeared to be mildly impaired and his short term memory was impaired moderately. (Tr. 311-313) Plump admitted to drinking heavily during his marriage and stated that he continued to drink two cans of beer twice per week. (Tr. 312) Plump also stated that he had abused cocaine prior to his imprisonment in 1996, but that he had not used drugs since. (Tr. 312) The impression was chronic alcohol dependence, history of cocaine dependence, major depression with alleged non-mood congruent psychotic features, history of stroke with resulting eye blindness, and other physical problems. (Tr. 311-13) On October 24, 2008, a non-treating, non-examining State agency reviewer, Patricia Beers Ph.D., filled out a psychiatric review technique and listed Plump's depression to be non-severe with mild ADL, social functioning, and concentration, persistence, and pace. (Tr. 328-41)

The record contains several statements, both by Plump and by medical professionals,

about Plump's drug use. Plump tested positive for cocaine in July 2007. (Tr. 293) In his October 2008 consultative psychological examination with Dr. Alan Jacobs, he reported that he had a history of drinking during his marriage, but that he was now down to "maybe two cans of beer twice a week." (Tr. 312.) He also stated that he had abused cocaine prior to his imprisonment in 1996 but that he had used no drugs since. (Tr. 312) He again admitted taking cocaine in June 2009. (Tr. 403)

A June 9, 2009, face-to-face disability field office interview noted difficulty with understanding, coherency, talking, answering, and seeing. (Tr. 228-30) In a September 28, 2008, ADL form, Plump noted that he could sleep only two or three hours at a time, sometimes would wear clothing that was not clean, did not feel like bathing or shaving, might pick up some paper in the yard in terms of chores, went outside at least once a day unless he was depressed, would shop about once per week, experienced pain in his knees, would get out of breath, and experienced arthritis in his elbow. (Tr. 216-26)

Dr. Alan Osei, a board-certified internist, conducted a consultative physical examination of Plump in October 2008. (Tr. 314-17) He noted that Plump alleged visual problems attendant to stroke and hypertension. Plump had a 137/87 blood pressure, osteoarthritis, and frequent headaches. Dr. Osei noted that Plump claimed to be blind in his right eye and to have glaucoma and blurred vision in his left eye. (Tr. 314) Plump further stated that he could not use computers as a direct result of his visual impairment and had not driven since 2007. (Tr. 314) Dr. Osei's notes described Plump's eyes as follows: "right eye shows no cataract and there is light perception and also finger counting. Visual field by confrontation is normal in the left eye. Fundus is not well visualized on the right but the left looks normal." (Tr. 315) The doctor's notes

also indicated that Plump reported being able to walk three blocks and used a self-purchased cane. He also could clean his own house, bathe, dress, cook, and shop. (Tr. 315) His examination showed that he had normal cervical range of motion, could walk more than 50 feet without support, and had full strength in his arms and legs. (Tr. 316) Plump's hygiene and grooming were good. (Tr. 316) Dr. Osei concluded that Plump had right-eye blindness, impairment of vision in the left, a history of hypertension, a history of recurrent headaches, and osteoarthritis of the knee joint with full range of motion. (Tr. 317)

Patricia A. Beers, PhD, reviewed the medical record and opined that Plump had alleged depression with psychotic features but that this was not confirmed by the medical evidence. (Tr. 340) She assessed Plump with mild limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 338) Furthermore, the doctor's opinion noted that Plump's self-reports of his activities of daily living showed that he could take care of himself, cook, perform household chores, walk, shop, pay bills, socialize with friends, and watch television. (Tr. 340) She noted that Plump's credibility was questionable, however, because his allegation of depression with psychotic features was not supported by the medical record or the consultative examination; because his description as having poor grooming skills was belied by the notes attendant to his two consultative examinations; and because he had repeatedly changed his story to medical professionals about his own cocaine use. (Tr. 340) Dr. Beers concluded that there was no credible evidence of a severe mental impairment. (Tr. 340)

Calixto Aquino, MD, also assessed the medical record and opined that Plump could lift 50 pounds occasionally and 25 pounds frequently and that he could stand, walk, or sit for about 6

hours of an 8-hour workday. Dr. Aquino also found that he had no postural, manipulative, communicative, or environmental limitations. (Tr. 343-344, 346) Dr. Aquino also noted that Plump "walks with a cane by choice," that his gait was non-antalgic, and that his range of motion was normal. (Tr. 343-344, 346) With regard to Plump's visual impairments, Dr. Aquino noted that Plump had limited near and far acuity but unlimited depth perception, accommodation, color vision, and field of vision. (Tr. 345) Specifically, Dr. Aquino noted that Plump was "blind in the right eye and 20/40 in the left without glasses." (Tr. 345) Dr. Aquino checked off a RFC for right eye blindness, HTN, and osteoporosis, finding him capable of medium work with limited near and far acuity. (Tr. 342-349)

The state-agency opinions were reviewed in April 2009 by Vidya Madala, MD and Donald Cochran, PhDMay 31, 2013 after the initial November 2008 denial. (Tr. 354-356) Drs. Madala and Cochran considered the additional evidence offered after the denial regarding Plump's allegations of degenerative joint disease, hypertension, and depression. The doctors concluded that the conditions had been fully evaluated at the initial consideration stage and that the additional evidence did not require that the initial denial be altered. (Tr. 356)

At the hearing before the ALJ, Plump testified that he was 58 years old at the time of the hearing and lived with his girlfriend in a one story home. (Tr. 49) He had a driver's license but did not drive because of his visual impairments. (Tr. 49-50) His education included two years of college and a medical billing certificate, but he had not been employed since 2005. (Tr. 50) His prior employment included work in medical billing, as a laborer, and medical record-keeper. (Tr. 51-53)

Plump testified that he could not perform his past employment because of his visual

impairments. (Tr. 53) A stroke in 2008 left him unable to see with his right eye and with limited vision in his left eye. (Tr. 54) He stated that before he lost his vision in 2008 he could have done his past employment but that the visual impairments would prevent him from returning to that work. (Tr. 54) His left eye still functioned, but he had blurred vision. (Tr. 54) He claimed to be unable to see small print. (Tr. 62)

In addition, Plump testified that he had arthritis problems in his knee, shoulder, back, and neck, for which he took Tylenol, Tramadol, and Naproxen. (Tr. 55-56) He had been experiencing the pain for approximately 2 or 3 years, and although it existed when he performed medical billing, the pain had increased over time. (Tr. 55) He further testified that his medications caused side effects, but he could not recall any. (Tr. 58) With respect to the pain in his right knee and left shoulder, he had "flares" every two or three months and swelling. (Tr. 56-57) He rated his shoulder pain as an 8/10. (Tr. 57) Plump stated that his back pain occurred twice per month and usually lasted a couple of days. (Tr. 57) He tried to exercise his knees and back as recommended by his neurologist to help with his arthritis. (Tr. 59) He had been using a cane for about two years and stated that a doctor had told him to get one if he needed it. (Tr. 58) Plump believed that he would fall without it, in part because he would trip over things he could not see. (Tr. 56) Following prompting by his attorney, Plump stated that he could walk only a block or so before his legs started to hurt. (Tr. 61)

When asked about his alcohol consumption, Plaintiff testified that he only drank "a little beer" and that the last time he had something to drink was a couple weeks before the hearing. (Tr. 58) The last he had been intoxicated was about three years before the hearing. (Tr. 58) When asked about illegal

drug use, Plump first stated that it had been about 8 years since he had used illegal drugs. (Tr. 58) When confronted with medical records from 2007 and 2009 indicating that he had reported taking cocaine, Plump responded "When? I don't remember." (Tr. 59) Later, under examination by his lawyer, he claimed that he had taken illegal drugs to alleviate his pain. (Tr. 63)

Plump also testified that he suffered from depression and anxiety and had anxiety attacks. (Tr. 59-60) He saw a psychiatrist every month and sometimes experienced anxiety weekly. (Tr. 60) He explained that at times he would get scared and would not go anywhere and that he had lost interest in activities. (Tr. 60) On a typical day he watched television, walked around the house, or went outside. (Tr. 60-61) He did not perform chores because he did not like them and could not perform them. (Tr. 61) Plump could walk one block before he got tired and could stand approximately 10 minutes. (Tr. 61-62) He could not read or see small print and watched television from a big screen, although he reported that it was blurry. (Tr. 62) Plump also explained that he could not see a computer since the stroke. (Tr. 62-63) Finally, Plump reported that the hospital was his primary care doctor because he did not have insurance. (Tr. 61)

Beverly Childress, Plump's girlfriend, also testified at the hearing. (Tr. 64-70) She stated that she had known Plump for 30 years and had lived with him for 10 years. (Tr. 65) Plump's medicines sometimes made him dizzy and caused him to fall. (Tr. 66) This occurred approximately once or twice a month. (Tr. 66) Plump's knees had scars from his falls and he had been using a cane for the past few years. (Tr. 68-69) Childress performed most of the chores at home, but Plump helped with "little stuff" like putting things in the garbage. (Tr. 66-67, 69) Plump spent most of his time watching television. (Tr. 67-68) Plump was blind in his right eye and had glaucoma in the other, which interfered with his ability to see. (Tr. 67)

Edward Stephen, a vocational expert, also testified at the hearing. (Tr. 70-85) He began by asking Plump a few questions to clarify the nature of his past work as performed. (Tr. 71-73) He identified Plump's prior work in accounts receivable as sedentary, skilled work; his work as a medical records clerk as light, semiskilled work; his work as a laborer as medium, semiskilled work; and his past work as a forklift operator as medium, low semiskilled work. (Tr. 73) He further testified that these descriptions were consistent with both the Dictionary of Occupational Titles ("DOT") and as Plump performed it. (Tr. 74)

The ALJ began by asking the vocational expert to consider a claimant with Plump's age (58 years at the time of the hearing, 53 years at the time of his alleged onset date), education (2 years of college), and work history. (Tr. 74) She limited the claimant to medium work and restricted him from exposure to heights or hazards. (Tr. 74) The hypothetical individual had neither near nor far acuity in the right eye and only occasional far acuity in the left eye. (Tr. 74) As a result, he would be unable to engage in computer activities. (Tr. 75) The vocational expert, interpreting this hypothetical as permitting near vision in the right eye, opined that Plump's past work as a shipping supervisor would remain viable, both as described in the DOT and as performed by Plump. (Tr. 75)

For the second hypothetical, the ALJ included only occasional near and far acuity in the left eye. (Tr. 75) The VE testified that it would preclude all work. (Tr. 76) The ALJ then inquired into janitorial work, DOT#382.664-010, stating that far acuity was not present and near acuity was occasional. (Tr. 76) The VE stated that the DOT that he was reading from did not address visual acuity at all and then explained that he did not have experience with how visual acuity impacted vocational activity. (Tr. 76) The VE stated then given the information from Westlaw,

the janitor would fit the hypothetical. (Tr. 77) The VE explained that there were 6,000 jobs in the lighter classification and approximately 65,000 jobs in the medium classification. (Tr. 77)

For the third hypothetical, the ALJ asked about medium work, no exposure to heights or hazards, no climbing ladders, ropes or scaffolds, no computer work, and work that accommodated someone who was blind in one eye. (Tr. 77) The VE explained that all past work would remain available. (Tr. 78) For the fourth hypothetical, the ALJ included that one eye still had vision, no fine detail type of tasks that would require him to be an inspector or work with an object smaller than a fist, only limited paperwork including punching a time clock, and no continual or frequent type of paperwork although occasional paperwork was possible. (Tr. 78) The VE stated the laborer position would remain. (Tr. 78) The ALJ then inquired whether other jobs would be viable if they were not performed at the SGA level, to which the VE identified laborer (20,000) (DOT #921.683-050) (then corrected with the help of the ALJ to DOT #922.687-058), janitor (DOT #382.664-101), and machine operator (excess of 10,000). (Tr. 78-79, 84) The jobs required minimal reading. (Tr. 79) For the fifth hypothetical the ALJ included that the individual could not work with an object smaller than a television screen to which the VE responded that all work would be precluded. (Tr. 79)

Counsel next inquired whether someone who had the same limitations as hypothetical four could perform the tasks with the use of a cane. (Tr. 79) The VE explained that the machine operator position would be viable. (Tr. 79-80). Counsel then asked the VE to consider the limitations posed in hypothetical one with the additional limitation of no hazards, including dangerous machinery. (Tr. 80) The VE responded that all work would be eliminated. (Tr. 80) Counsel then inquired whether the hypotheticals above included someone falling at least twice

per month, and the VE explained there would be no work. (Tr. 83) Finally, Counsel asked whether the laborer, machine operator, and janitor positions required full use of both arms and hands, to which the VE responded "yes." (Tr. 85)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 24-37)  In step one, the ALJ found that Plump had not engaged in substantial gainful activity since July 1, 2005, his alleged onset date. (Tr. 29) At step two, the ALJ found that Plump had the severe impairments of right eye blindness, limited vision with his left eye, hypertension, and degenerative joint disease, and non-severe impairments of depression and drug and alcohol dependence. (Tr. 30-31) At step three, the ALJ then found Plump did not satisfy listings 1.02, 2.02 or 4.00. (Tr. 31-32)

In determining Plump's RFC, the ALJ thoroughly discussed all of Plump's symptoms which could "reasonably be accepted as consistent with the objective medical evidence" and followed a two-step process, first determining whether there could be a medically acceptable basis for his complaints, and second evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited his work ability. (Tr. 32)  The ALJ determined that Plump had the RFC to perform less than a full range of medium work with no exposure to heights or hazards, no climbing ladders, ropes or scaffolds, no computer work, work that accommodated an individual who was blind in the right eye, no fine detail work (like inspection that involved working with objects smaller than a fist), only occasional paperwork, and only occasional reading. (Tr. 32)

The ALJ summarized Plump's medical history and the testimony from the hearing.  (Tr. 33-34) The ALJ concluded that Plump retained sufficient visual abilities to perform basic work

functions. (Tr. 34) The ALJ explained that she could not find record of the stroke or other significant records demonstrating the origins of Plump's visual impairments or subsequent treatment. (Tr. 34) Examination records from October 2008 indicated that Plump's visual acuity was 0 in the right eye and 20/40 in the left eye without correction. (Tr. 34) A consultative examiner noted that Plump had right eye light perception and finger counting and that his visual field by confrontation was normal in the left eye. (Tr. 34) To accommodate his visual impairments, the ALJ limited Plump to no computer work, work that accommodated someone who was blind in the right eye, no fine detail work that involved working with objects smaller than a fist, only occasional paperwork, and only occasional reading. (Tr. 34)

The ALJ next explained that the medical records demonstrated few abnormalities with Plump's hypertension and degenerative joint disease. The notes related to Plump's hypertension were sparse in terms of diagnosis and treatment. (Tr. 34) The ALJ acknowledged that Plump's hypertension was uncontrolled in September 2008, but she explained that Plump was not taking any hypertension medication at that time. (Tr. 34) The ALJ also explained that the record demonstrated that Plump's degenerative joint disease was unremarkable. (Tr. 34) It was treated conservatively with Tylenol, Plump had a normal gait, no tenderness, no edema, and stable knees. (Tr. 34) The ALJ also acknowledged that Plump was diagnosed with cervical radiculitis, cervical sprain, cervical degenerative joint disease, and cervical radiculopathy. (Tr. 34) The ALJ noted that the record was devoid of significant and continued treatment for these diagnoses. She further explained that at the consultative examination, Plump could get on and off the exam table with no difficulty, could walk greater than 50 feet without support, his gait was non-antalgic without the use of an assistive device, he was able to walk toe to heel, his grip strength was

normal in both hands, he had a normal ability to grasp and manipulate objects, he had a normal range of motion in his shoulders, elbows, wrists, hips, knees, ankles, cervical spine, and lumbar spine, and his straight leg tests were negative bilaterally. (Tr. 34-35) To account for Plump's hypertension and degenerative disc disease, the ALJ limited Plump to work involving no exposure to heights or hazards and no climbing ladders, ropes, or scaffolds. (Tr. 35)

The ALJ found that Plump's testimony was inconsistent with his prior statements, course of treatment, and daily living. (Tr. 35) Plump's alleged onset date was July 1, 2005, yet he testified that he could have done work until he had his stroke in 2008. (Tr. 35) Plump also testified that he had not used any illegal drugs for 8 years, and upon questioning by his attorney, he admitted to drug use in 2007 and 2009. (Tr. 35) Plump also testified that he needed a cane to ambulate, but the cane was not prescribed and the evidence does not support the need for a cane. (Tr. 35) Plump was unable to offer a persuasive reason for why he could not perform household chores, a statement which contradicted his earlier admission that he could clean his own house, cook, and shop. (Tr. 35) Childress also testified that Plump never performed much in the way of household chores during the ten years they lived together and before his alleged disability onset date. (Tr. 35) For these reasons, the ALJ found Plump's allegations in excess of the limitations demonstrated by the record. (Tr. 35)

The ALJ gave great weight to the assessments of the state agency medical consultants. (Tr. 35) The ALJ summarized their findings and concluded that the assessments were informed, consistent with the medical evidence of record, and consistent with the record as a whole. (Tr. 35) Specifically, the ALJ noted that their assessments were consistent with the medical records from the treating sources, examinations and evaluation reports by consulting physicians, and the

opinions from the non-examining state agency medical consultants.  (Tr. 36)

With the RFC determined, at step four the ALJ found that Plump could not perform his past relevant work.  (Tr. 36) At step five, the ALJ found that considering Plump's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy that he could perform, including that of janitor (65,000 jobs regionally).  (Tr. 36)

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852 (1972)(*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

15

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable " to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.**" 42 U.S.C. §423(d)(1)(A).** The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R.  § § 404.1520, 416.920**.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R.§§ 404.1520(b), 416.920(b).**  If he is, the claimant is not disabled, and the evaluation process is over.  If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c).**  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.**  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e).**  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of

performing other work and that such work exists in the national economy. **42 U.S.C. §**
**423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).**

Plump first argues that the ALJ improperly evaluated his visual impairments by ignoring
significant medical records. SSR 96-8p explains how an ALJ should assess a claimant's RFC at
steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion
Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This
section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations). In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record. The adjudicator must
> also explain how any material inconsistencies or ambiguities in the evidence in
> the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a
difference between what the ALJ must contemplate and what she must articulate in her written
decision. "The ALJ is not required to address every piece of evidence or testimony presented,
but he must provide a 'logical bridge' between the evidence and his conclusions." ***Getch v.***
***Astrue***, 539 F.3d 473, 480 (7th Cir. 2008)(quoting ***Clifford v. Apfel***, 227 F.3d 863 (7th Cir.
2000)).

In December 2007, Plump was found to have an ischemic CRVO in his right eye and
glaucoma in both eyes with a visual acuity of 0 in the right eye and 20/50 in the left. On
subsequent visits between 2008 and 2010, Plump's left eye acuity was recorded at 20/30 with

notes of blurred vision and glaucoma, and several other notes recorded glaucoma, blurred vision, and suggested electroretinographic changes. Plump argues that the ALJ relied solely on the opinion of the consultative examiner's report, and because the consultative examiner was an internist, rather than an opthalmologist, this reliance was misplaced. Additionally, the consultative examiner noted that there was an impairment to the left eye. Based on the consultative examiner's report, the state agency reviewing physician, a family physician, found that Plump was limited in both near and far acuity. Plump criticizes the ALJ's decision as being devoid of any note of the opthalmology records with respect to his CRVO and glaucoma and their resulting treatment, and he complains that there was no evidence of record which showed that he was capable of occasional paperwork and reading.

The Commissioner responds that Plump is mischaracterizing the evidence because CRVO was recorded in Plump's right eye only. Plump does not dispute that the CRVO was present only in his right eye, but he maintains that he was diagnosed with glaucoma in his left eye, that there were reports of blurred vision in his left eye, and that he had severe electroretinographic changes in his left eye which the ALJ did not account for. Upon review of the ALJ's opinion, she did not mention Plump's glaucoma or blurred vision. Dr. Osei, the state consultative examining physician on whose opinion the ALJ relied, did note that Plump reported that he experienced glaucoma in his left eye, which had resulted in blurred vision, but upon examination, he did not conclude that Plump had glaucoma. By relying on Dr. Osei's opinion, which considered the possibility of glaucoma and blurred vision, the ALJ might have implicitly considered these limitations. However, Dr. Osei's examination did not reach the same conclusion as Plump's treating opthomologist, creating a conflict between the opinion of the

treating physician and the state consultative doctor.

Generally, the ALJ must give the treating physician's opinion greater weight than that assigned to a state consultative physician's opinion. Inconsistencies in a treating physician's opinion, whether conflicting internally or with other substantial evidence in the record, may justify denying the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). *See, e.g., Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or rejecting evidence of disability."); *Latkowski v. Barnhart*, 93 Fed. Appx. 963, 969 (7th Cir. 2004)(same). If the ALJ chooses not to give the treating physician's opinion controlling weight, she is required to provide a sound explanation for her decision to reject it. *Roddy,* 705 F.3d at 636 (7th Cir. 2013).

At a minimum, the ALJ was required to provide an explanation for rejecting the conflicting opinion between Plump's treating opthamologist and Dr. Osei. The ALJ's implicit consideration of Plump's glaucoma and blurred vision through consideration of Dr. Osei's note did not satisfy this duty. The ALJ failed to explain how the medical evidence contradicted the opinion of Plump's treating opthamologist or why the opinion of Plump's opthamologist, an expert in the field, should be rejected for that of the reviewing consultative physician, who did not specialize in opthomology or see Plump on a regular basis. The ALJ must provide some explanation for rejecting these impairments or show that they were taken into consideration when determining the RFC.

Additionally, the Commissioner argues that nothing in the record supports more restrictive limitations than those imposed. Although it is true that none of the physicians opined that Plump should be restricted to less than occasional paperwork and reading, it was the ALJ's duty to develop the record. The record does not reflect that the ALJ considered the effect that glaucoma or blurred vision would have had on Plump's ability to perform these tasks, that the opinions she relied on considered the effects, or that the ALJ explained why these impairments did not need to be taken into consideration. The ALJ had a duty to consider the effects of all the claimant's limitations and to explain the reasons she rejected medical evidence that contradicted her conclusion. Here, the record is devoid of any consideration of documented impairments or explanation for why these impairments did not require greater restrictions. For these reasons, the ALJ did not provide a sufficient explanation and has not satisfied her obligations.

Plump next complains that the ALJ erroneously determined that his depression and drug and alcohol dependence were not severe. Specifically, he argues that the ALJ ignored evidence that his short-term memory was impaired moderately and that he had difficulty with understanding, coherency, talking, answering, and understanding questions. He also claims that the ALJ failed to consider the effect his depression had on his activities of daily living, the ALJ did not address the reasons Plump failed to pursue additional care for his depression and substance dependence, the ALJ failed to consider the effect of Plump's depression even if it was not a severe impairment, and the ALJ did not incorporate the mild limitations she found in Plump's activities of daily living, social functioning, and concentration, persistence, and pace into the hypotheticals posed to the VE.

Plump has pointed to numerous records in which he sought treatment for psychological

impairments and which note prescriptions for psychiatric medications that the ALJ did not consider. Plump relies on the report from the disability field office interview, which he characterizes as listing difficulty with understanding, coherency, talking, answering, and understanding questions. The interviewer recorded that Plump described himself as depressed and a loner. Plump was cooperative and polite during questioning. He did not reflect delusion, paranoia, or grandiosity. Plump was oriented, his long-term memory was mildly impaired, and his short-term memory was impaired moderately. The interviewer asked a series of questions, to which Plump responded. He was able to give correct products for two single digit multiplication questions, but he failed on the second step of serial sevens. He was able to name four presidents since the mid 1970s and repeat four digits forward and two in reverse. The interviewer concluded that Plump likely was within the average range of intellectual functioning.

Plump's characterization of the evidence is not entirely accurate. Plump displayed some difficulty with his memory, but the record does not reflect that he had difficulty talking, answering, and understanding questions. Plump was able to respond to the questions which the consultative examiner and the ALJ posed. The ALJ considered all of the evidence of record and found that Plump was able to answer questions satisfactorily relating to his memory, calculation, and knowledge, and the record as a whole revealed average intellectual functioning. None of the other evidence reflected that Plump had any difficulty with his short-term memory, nor does Plump show how this would affect his RFC. The ALJ pointed to records showing that Plump's depression was stable and that he responded to questions concerning memory. The ALJ was not required to adopt the consultative examiner's opinion in its entirety and explained that Plump was able to respond to questions, some of which related to memory, and had average

intelligence.

Plump also complains that the ALJ failed to consider the medications he was prescribed for depression. The ALJ listed one medication, Wellbutrin, but Plump points to two additional prescriptions. The record reflects that the ALJ considered that Plump was taking medication for depression, yet found that Plump's depression was controlled and did not bear on his RFC and, as explained below, the ALJ was not required to consider the side effects of these medications.

Plump criticizes the ALJ's reliance on the lack of substantive medical records, arguing that the ALJ should have inquired about Plump's reasons for failing to seek more medical care. Plump is correct that the ALJ must ask the claimant the reasons he failed to seek treatment. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance); *Roddy,* 705 F.3d at 638 (7th Cir. 2013) (explaining that the ALJ must elicit a reason for failing to pursue medical treatment). However, here it does not appear that the ALJ was relying on the lack of doctors visits. Rather, the ALJ's explanation reflected that she was relying on the lack of substantive diagnoses and recommended treatment within the existing notes. The ALJ stated that the notes reflected few abnormalities and that the 2008 notes reflected that Plump's depression was stable. In any case, Plump continually sought treatment at the emergency room because he did not have health insurance. Although he reported to the emergency room for numerous other health concerns, there were few notes from these visits that acknowledged Plump's depression.

Moreover, the consultative examination mentioning depression and its resulting limitations were based on Plump's responses, and consequently, the physician's assessment of Plump's credibility. The ALJ provided a thorough explanation for finding Plump's testimony

unreliable, citing to discrepancies in his statements about activities of daily living and drug use.

The ALJ's credibility finding only should be overturned if patently wrong, and as explained

below, the ALJ's credibility finding was not.  In addition to discounting Plump's testimony as a

means of finding his depression not to be a severe impairment, the ALJ also pointed to the

objective findings in the consultative examiner's report.  The consultative examiner noted that

Plump could respond to questions, was polite and cooperative, and had average intelligence.

The ALJ also pointed to Dr. Beer's assessment, completed the same month as the consultative

examination, which found that Plump's depression was not severe.

Plump next criticizes the ALJ for failing to consider the effect of his depression even if it

was not a severe impairment.  *See **Golembiewski v. Barnhart***, 322 F.3d 912, 918 (7th Cir. 2003)

(explaining that the ALJ "needed to consider the aggregate effect of this entire constellation of

ailments–including those impairments that in isolation are not severe.").  In the section of her

opinion where the ALJ found that Plump's depression was not a severe impairment, the ALJ

went on to consider Plump's depression as it related to the broad functional areas set forth in the

disability regulations for evaluating mental disorders.  Specifically, she considered the effect of

Plump's depression and alcohol dependence on Plump's activities of daily living, social

functioning, and concentration, persistence, and pace.  Although Plump suffered from

depression, he was able to maintain the same daily activities as before his alleged disability onset

date, he did not display any difficulty interacting with others, and was able to answer questions

satisfactorily related to memory, calculation and knowledge, and he had average intelligence.

The ALJ's explanation is clear why she did not consider Plump's depression and substance

abuse to be a severe impairment, but she did find that these impairments caused minimal

limitation in Plump's ability to perform mental work activities.  The ALJ seems to ignore this finding in her RFC analysis.   The ALJ restated that Plump suffered depression, but she provided no explanation of any resulting limitations, nor did she explain the reasons why this non-severe impairment did not require any limitations on Plump's mental functioning.  On remand, the ALJ must explain what effect, if any, Plump's mild limitations in mental functioning had on his RFC.

Plump finally argues that the ALJ did not incorporate the mild limitations she found in Plump's activities of daily living, social functioning, and concentration, persistence, and pace into the hypotheticals she posed to the VE.  Generally, the ALJ must incorporate all of the limitations she finds into the hypotheticals posed to the VE.  ***O'Connor–Spinner v. Astrue***, 627 F.3d 614, 619 (7th Cir. 2010).  Although the wording does not have to be identical, it must be clear that the limitations were accounted for.  ***Bryant v. Astrue***, 2012 WL 3114553, *5 (July 31, 2012).  The ALJ noted that Plump had mild limitations in mental functioning, yet the record does not reveal that the ALJ included this limitation or any variation in the hypotheticals she posed to the VE.  For this reason, the ALJ must reconsider the availability of positions for someone with this added limitation.

Plump next complains that the ALJ did not mention his cervical or shoulder impairment at step two.  Plump acknowledged that the ALJ referenced his diagnoses of cervical radiculitis, cervical sprain, cervical degenerative joint disease, and cervical radicuopathy, but argues that she then failed to explain why they were not considered at step two nor did she consider the potential financial barriers Plump faced.  Plump points to numerous medical records that refer to his shoulder or cervical impairments.  The ALJ found Plump's degenerative joint disease as a severe impairment, but she wholly ignored Plump's diagnoses of cervical radiculitis, cervical sprain,

cervical degenerative joint disease, and cervical radicuopathy in step two. When explaining her RFC, the ALJ stated that the record was devoid of significant, continued, and corresponding treatment for these diagnoses, and she noted that at his consultative examination Plump was able to walk without the use of an assistive device, perform toe/heel walk, had normal grip strength, full range of motion in his shoulders and that the other tests performed were essentially normal.

The ALJ noted that the record does not contain enough doctor's notes pertaining to these impairments and their treatment. However, the ALJ did not elicit testimony from Plump to explain the absence of further treatment and did not consider Plump's financial condition, which may have interfered with his ability to obtain further treatment. **SSR 96–7p** (explaining that the ALJ must not draw inferences from a failure to pursue regular medical treatment without considering any explanation the individual may provide). Although the ALJ pointed to the consultative examination that revealed normal strength and movement, it is not clear that the ALJ would have made this same assessment if additional medical evidence, the medical treatment that Plump may not have been able to afford, corroborated Plump's existing records. The ALJ's decision was due in part to the lack of corroborating evidence, and without consideration of the reason more medical evidence existed, the court cannot assume that the ALJ would have reached this same conclusion. On remand, the ALJ must consider Plump's reason for failing to seek more treatment for these diagnoses and further explain why these impairments were not considered severe impairments.

Plump next criticizes the ALJ's credibility finding. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir.

2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimaint's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529(c)**; *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations

and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also* **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004); **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).

> **Luna v. Shalala**, 22 F.3d 687, 691 (7th Cir. 1994); *see also* **Zurawski v. Halter**, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight." SSR 96-7p, at *2. *See* ***Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). She must "build an accurate and logical bridge from the evidence to [his] conclusion." ***Zurawski***, 245 F.3d at 887 (*quoting* ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000)). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See* ***Zurawski***, 245 F.3d at 888 (*quoting* ***Bauzo v. Bowen***, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Plump complains that the ALJ erred in her credibility determination because she failed to analyze properly his daily activities, medication and side effects, and measures other than medical treatment that he used to relieve symptoms. Upon review of the record, the court finds that the ALJ provided abundant support for her credibility determination. She explained that Plump made changes to his testimony regarding his past drug and alcohol use. It was not until his attorney questioned him that he admitted to using drugs a few times over the past few years. The ALJ did not discount Plump's testimony because he used drugs, rather she did so because he lied about his drug use, diminishing his credibility.

The ALJ also stated that Plump was not credible because he testified that he was prescribed the use of a cane, but the medical records did not support that statement. Rather, the doctor's notes stated that Plump used the cane by choice. The regulations allow for the ALJ to

consider inconsistencies between the medical evidence and the claimant's testimony when assessing credibility.  Plump complains that the ALJ erred in assessing credibility on this basis, pointing to the notes from the consultative examination where he reported balance issues and the need for a cane.  Plump complains that the ALJ played doctor by ignoring this.  However, Plump's argument fails for two reasons.  First, the ALJ pointed to the inconsistency between Plump's testimony and the absence of any medical record prescribing the use of a cane to show that Plump's testimony was unreliable.  Second, the record Plump points to was his own report to the consultative examiner that he needed a cane.  Plump has not referred the court to any doctor's notes that advised the use of a cane.  Plump cannot bolster his credibility by pointing to his own earlier statement where the ALJ's explanation centers on the fact that no doctor prescribed the stated remedy.

Plump also complains that the ALJ failed to consider his medications and their side effects.  The ALJ has no duty to make specific findings about the effects of a claimant's medications.  *See **Misener v. Astrue***, ---F.Supp.2d---, 2013 WL 633287, *14 (N.D. Ind. 2013)(citing **Labonne v. Astrue**, 341 Fed. Appx. 220, 226 (7th Cir. 2009).  However, if the ALJ chooses to make a finding concerning the claimant's side effects, it must be supported by substantial evidence.  **Misener**, 2013 WL 633287 at *14.

The ALJ did not make a specific finding concerning Plump's side effects, nor was she required to.  Even so, the evidence concerning Plump's side effects was so scant that it would be futile to remand for consideration of Plump's side effects.  Plump himself could not describe the side effects, there are no medical records describing the side effects, and Childress' testimony, the only evidence of side effects, did not describe the duration and extent of the side effect.  It

would be impossible for the ALJ to account for side effects that could not be explained.

Plump next criticizes the ALJ's assessment of his activities of daily living. The ALJ noted that Plump testified that he could not perform chores around the house but found that this statement was inconsistent with a prior admission that he was cable of cleaning his home, bathing, dressing, cooking, feeding himself, and shopping. Plump complains that other evidence of record corroborated his testimony, that the ALJ relied on his lack of desire to perform activities of daily living without considering that his lack of desire may be due to his depression, and that the ALJ failed to consider that his testimony addressing his inability to perform many activities of daily living was not inconsistent with his disability. Plump's lack of desire only was one factor among many that the ALJ considered when determining whether Plump was capable of performing activities of daily living. The ALJ also relied on Plump's physical abilities as indicated in the consultative report, which found that Plump had a normal gait, could walk heel to toe, had normal strength, and had normal movement in his extremities. The function report also indicated that Plump could socialize with friends and family, undermining his claims of depression. Certainly, there was evidence of record that corroborated Plump's testimony, but the court will not overturn a credibility determination unless it is patently wrong. The ALJ's reliance on Plump's inconsistent statement was not only used to bolster the ALJ's assessment of Plump's ability to perform activities of daily living but also to show that Plump's testimony was unreliable because he was inconsistent when reporting his abilities and lacked credibility. The ALJ pointed to sufficient evidence, including inconsistent statements and medical records that suggested that Plump was physically capable of performing activities of daily living to support his finding.

Plump also argues that the ALJ failed to explain the weight she attached to Childress' testimony. Childress' testimony mirrored Plump's testimony. She stated that Plump was prescribed the use of a cane and that Plump did not perform chores around the house, adding that prior to his alleged disability onset date, he did not help around the house. Childress also stated that Plump did not have a substance abuse problem. Although the ALJ did not provide much explanation for finding Childress' testimony not credible, because her statements mimicked Plump's, it is apparent that the ALJ rejected her statements for the same reasons she discredited Plump's. *See Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (explaining that the ALJ's failure to explain reason for discounting witness' testimony was harmless error because her testimony described the same limitations as the claimant's).

Plump finally argues that the ALJ's step 5 finding was erroneous because she provided a deficient RFC, rendering her hypotheticals incomplete. Specifically, the ALJ did not account for Plump's depression, mild social functioning and concentration limitations, persistence, and pace limitations, his use of a cane, greater visual acuity limitations to the left eye, left shoulder adhesive capsulitis, cervical radicuopathy, headaches, or prescriptions side effects. The court already has stated the impairments the ALJ must readdress on remand. Accordingly, the ALJ must reassess the number of positions available to Plump if she determines that any of the impairments she must consider on remand affect her RFC determination.

Based on the foregoing, the decision of the Commissioner is **REMANDED**.

ENTERED this 3rd day of June, 2013

/s/Andrew P. Rodovich
United States Magistrate Judge

31